

**U.S. Department of Justice**

Consumer Protection Branch

---

**Amy P. Kaplan**
Phone:  (202) 598-8153
Amy.p.kaplan@usdoj.gov

**Overnight Delivery Address:**
450 5th Street, NW, Room 6400-South
Washington, DC 20001

**Mailing Address:**
P.O. Box 386
Washington, DC 20044-0386

USDC- BALTIMORE
'24 MAR 19 PM 3:44

January 31, 2024

David Irwin
Kramon & Graham PA
One South Street, Suite 2600
Baltimore, MD 21202
dirwin@kg-law.com

    Re:    <u>Theodore Sapperstein</u>   DKC-24-73

Dear Counsel:

    This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Theodore Sapperstein (hereinafter "Defendant"), by the U.S. Department of Justice, Consumer Protection Branch, and the U.S. Attorney's Office for the District of Maryland (collectively, the "Government"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **February 14, 2024**, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

    1.    The Defendant agrees to waive indictment and plead guilty to a one-count information, which will charge the Defendant with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

Elements of the Offense

    2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which the Government would prove if the case went to trial, are as follows: That on or about the time alleged in the information, in the District of Maryland,

    a. there was an agreement among two or more persons to accomplish a common and unlawful plan to commit a fraud crime listed in Title 18 Chapter 63, as charged in the information, that is, bank fraud in violation of U.S.C. § 1344(1), the elements of which are as follows:

      i. knowingly executing a scheme or artifice to defraud a financial institution by means of material false or fraudulent pretenses, representations or promises;

      ii. with the intent to defraud the financial institution; and

      iii. the financial institution was federally insured; and

   b. the Defendant knew of the unlawful purpose of the plan and willfully joined it.

Penalties

3.     The maximum penalty provided by statute for the offense to which the Defendant is pleading guilty is as follows:

| Count | Statute | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | 30 years | 5 years | $1,000,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest | $100 |

   a.     Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

   b.     Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

   c.     Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

   d.     Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

   e.     Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      Collection of Debts: If the Court imposes a fine or restitution, the Financial Litigation Unit of the United States Attorney's Office for the District of Maryland will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes the Government to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by the Government.

## Waiver of Rights

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, the Government, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

  e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

  f. By pleading guilty, the Defendant will be giving up all of these rights, including the rights set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

  g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

  h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

6. The Government and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

a.    The Government and the Defendant further agree that the following base offense level and adjustments apply:

| | |
|---|---:|
| Base Offense Level [U.S.S.G. §§ 2B1.1(a)(1), 2X1.1(a)] | 7 |
| Loss Exceeded $1,500,000 [§ 2B1.1(b)(1)(I)] | +16 |
| Offense Involved 10 or More Victims [U.S.S.G. § 2B1.1(b)(2)(A)] | +2 |
| Offense Involved Sophisticated Means [U.S.S.G. § 2B1.1(b)(10)(C)] | +2 |

b.    The Government does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. The Government agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. The Government may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, the Government, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

c.    The Defendant reserves the right to seek a 2-level reduction in the offense level pursuant to U.S.S.G. § 3B1.2 based on the Defendant's mitigating role in the offense. The Government reserves the right to oppose any adjustment pursuant to U.S.S.G. § 3B1.2.

d.    The parties agree that if the Defendant meets all the criteria set forth in U.S.S.G. § 4C1.1, a further 2-level downward adjustment in the applicable offense level will be appropriate at sentencing.

7.    There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.    Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, the Government and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). The Government and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that the Government or the Defendant deem relevant to sentencing.

## Waiver of Appeal

10. In exchange for the concessions made by the Government and the Defendant in this Agreement, the Government and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

   c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from the Government or any investigating agency.

## Restitution

11. The Government does not presently intend to seek restitution paid to victims on the basis of Defendant's conviction. The parties agree that the number of identifiable victims of the conspiracy is so large as to make restitution impracticable, and/or determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

## Forfeiture

12. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable

to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13. Specifically, but without limitation on the Government's right to all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in anything that constitutes money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

14. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

15. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

16. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

17. The Government does not presently plan to seek an order of forfeiture of assets, due to the Defendant's legal obligation to disgorge certain profits from the fraud scheme pursuant to a settlement with the court-appointed receiver in *United States v. Internet Transaction Services, Inc.*, 2:21-cv-6582-JFW (C.D. Cal.) ("Intertrans Receiver") (*see* ECF No. 143). The Government reserves the right to later seek forfeiture of assets if the Government determines that the amount of assets traceable to Defendant's offense exceeds the amount disgorged to the Intertrans Receiver, and/or if the Defendant fails to make timely payments toward his obligations to the Intertrans Receiver, in which case the provisions set forth in paragraphs 12 through 16 above shall apply.

### Defendant's Conduct Prior to Sentencing and Breach

18. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, the Government, law enforcement agents, and probation officers;

will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

19. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) the Government will be free from its obligations under this Agreement; (ii) the Government may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, the Government will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that the Government is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

20. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Government's Agreement

21. In exchange for the Defendant's guilty plea and other obligations in this agreement, the Government agrees not to file any other charges against Defendant for the conduct outlined in the Statement of Facts in Attachment A, unless Defendant breaches this plea agreement or the guilty plea entered pursuant to this plea agreement is set aside for any reason.

### Entire Agreement

22. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between the Government and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and the Government other than those set forth in this letter and the Sealed Supplement. No changes to

this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

AMANDA N. LISKAMM
Director, U.S. Department of Justice,
Consumer Protection Branch

_____
AMY P. KAPLAN
WEI XIANG
MEREDITH B. HEALY
Trial Attorneys

and

EREK L. BARRON
United States Attorney

_____
DARRYL L. TARVER
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

2/13/2024                    _____  3/19/2024
Date                         THEODORE SAPPERSTEIN

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

2/13/2024                    _____
Date                         DAVID IRWIN

9

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

From in or before August 2020, until on or about August 2021, Defendant conspired and knowingly entered into an agreement with one or more other persons to knowingly and with intent to defraud, execute and attempt to execute, a scheme to defraud financial institutions as to material matters, in violation of 18 U.S.C. § 1344(1). Defendant operated a business in Pikesville, Maryland, which he used in furtherance of the fraud scheme. Coconspirator "CC-1" once worked for a business ("Company A") in Long Beach, California. Coconspirator "CC-2" operated a payment processor based in Las Vegas, Nevada. Defendant had helped introduce Company A to CC-2 in 2017 for payment processing services.

As Defendant knew, and as was reasonably foreseeable to him, Defendant and his coconspirators created and caused to be created business entities (each a "Shell Entity" or "merchant"). As Defendant knew, and as was reasonably foreseeable to him, the Shell Entities were used to make unauthorized debits against consumer-victims' bank accounts (the "Consumer Bank Accounts") that were held and serviced by banks across the United States (the "Consumer Banks"). These unauthorized debits removed funds from the Consumer Bank Accounts and caused them to be deposited into bank accounts controlled by or for the Shell Entities (each a "Shell Entity Bank Account") at "Originating Banks." Many Originating Banks and Consumer Banks were federally insured. Defendant was aware that CC-1 at times attempted to "recycle old data"—*i.e.*, charge consumers that had already been debited by other Shell Entities.

When a Consumer Bank, Originating Bank, or other person or entity requested proof of authorization ("POA") for a debit against a Consumer Bank Account, Defendant and his coconspirators provided false and fraudulent documentation to be presented to the requester, claiming that the consumer-victim had authorized the debit, as a payment to a Shell Entity for a subscription for a service provided by the Shell Entity, by signing up for the Shell Entity's service through the Shell Entity's website.

Defendant and his coconspirators knew and believed that the number of "returns" (that is, rejections by the Consumer Banks) of the consumer-victim debits, and a Shell Entity's percentage of returns in comparison to all debits ("return rate"), often caused and would cause scrutiny from the Originating Banks. For example, Defendant and coconspirators knew and believed that, for Automated Clearing House ("ACH") debits, National Automated Clearing House Association ("NACHA") rules imposed certain thresholds for acceptable return rates and certain obligations on Originating Banks to monitor return rates. Defendant and coconspirators knew that high return rates could cause the Originating Banks to stop originating debits for the Shell Entities and therefore restrict the coconspirators' ability to further debit Consumer Bank Accounts.

10

Depending on the return rates of the unauthorized consumer-victim debits, Defendant and coconspirators regularly caused Originating Banks to originate, for the Shell Entities, thousands of "micro" debits (also referred to as "friendly" or "affiliate" traffic, debits, or transactions) against Shell Entity Bank Accounts at other financial institutions, withdrawing a small amount of money with each debit. Since coconspirators controlled the Shell Entity Bank Accounts, Defendant and coconspirators knew these micro debits would not result in returns and would therefore artificially suppress the Shell Entity return rates at Originating Banks.

Defendant knowingly participated in the conspiracy in at least three key ways:

Defendant opened bank accounts, and coordinated with the coconspirators who opened bank accounts to fund micro debits to reduce the return rates on Shell Entities' Bank Accounts for the purpose of concealing and disguising their return rates. For example, on December 1, 2020, Defendant informed CC-2, "I'm using my account as the debit account the [sic] for some microdebits [sic]— Maybe 150 to 200 a day as an ancillary affiliate debit account—[.]" CC-2 responded, asking whether the account used for micro debits would be under the same name as the merchant account, reasoning that "since you are officially designated as the merchant (HAYES MARKETS) it would not normally make sense to debit yourself . . . having the same name . . . like you're trying to manufacture extra debits you know will clear (Nacha hates that of course)[.]" Defendant responded, "Named 3217 Hamilton LLC[.]"

Relatedly, Defendant tracked the Shell Entities' return rates and calculated the number of micro debits necessary to reduce return rates to levels that, as the Defendant and coconspirators understood and believed, would avoid Originating Banks' scrutiny and potential termination of banking services. For example, on December 30, 2020, Defendant emailed CC-1 that "[t]he numbers are still bending back our way thanks to the affiliate debits we have all pooled to do. . . . Monday morning I can do another fresh analysis but I think we will make that .45 [return rate] threshold and 3500 [micro debits] a day should hold the fort until returns drop again—which I know they will from tracking them. We will keep adjusting to the return rate as we go." Additionally, on March 18, 2021, in an email exchange with CC-1 in which Defendant lamented their "skimpy" payouts and CC-1 responded that "[t]he transaction count will go up, volume would increase, etc. but we need to be prepared for needing more affiliate micro debits on your side to combat those higher returns," Defendant replied, "[w]e have plenty of room for more affiliate debits. ***Plenty***. Bring on any and all transactions. Period. Bring them on. Are we clear? More. Bring. Wife needs more $$$ to spend."

Defendant also knowingly helped broker payment processing for the fraud scheme. Defendant brokered CC-2 as a payment processor to process unauthorized debits and micro debits in furtherance of the fraud scheme. With Defendant's knowledge and at Defendant's direction, CC-2, through CC-2's payment processing company, processed unauthorized debits from consumer bank accounts and deposited proceeds from the unauthorized debits into a bank account for Defendant's Maryland-based company. In addition to processing transactions for the fraud scheme, with Defendant's knowledge, CC-2 helped the scheme reduce return rates and avoid detection, for example, by advising Defendant regarding the use of micro debits. In response to requests for proof that a debit against a Consumer Bank Account was authorized from CC-2's payment processing company, Defendant provided fake documentation, or POAs, claiming the

11

consumer had authorized charges. Defendant obtained at least some of these fake POAs from CC-1. For example, on or about December 15, 2020, Defendant asked CC-1 for a POA for a consumer, and then later forwarded the POA received from CC-1 to an employee of CC-2's payment processing company. Defendant wrote, "Try these—" and attached a fake email and order confirmation claiming the consumer had authorized charges from a Shell Entity. In response to an email from CC-2 inquiring about the status of POA requests on or about February 12, 2021, Defendant responded that he has "been religiously responding to POA requests" from an employee of CC-2's payment processing company.

Defendant admits and agrees that more than $1.5 million in loss was reasonably foreseeable to Defendant and within the scope of Defendant's agreement with coconspirators.

SO STIPULATED:

AMANDA N. LISKAMM
Director, U.S. Department of Justice, Consumer Protection Branch

*/s/ Amy Kaplan*

AMY P. KAPLAN
WEI XIANG
MEREDITH B. HEALY
Trial Attorneys
Department of Justice
Consumer Protection Branch

and

EREK L. BARRON
United States Attorney

*/s/*

DARRYL L. TARVER
Assistant United States Attorney

*/s/ Theodore Sapperstein*

THEODORE SAPPERSTEIN
Defendant

*/s/ David B. Irwin*

DAVID IRWIN
Counsel for Defendant

12